APPELLANT'S TRANSCRIPT ON APPEAL
NO. SD35695
MISSOURI COURT OF APPEALS
SOUTHERN DISTRICT

\* \* \* \* \* \*

TEVIN L. WILLIAMS,          )
                            )
        Movant-Appellant,   )
                            )
        vs.                 )  In the Circuit Court of
                            )   Greene County, Missouri
STATE OF MISSOURI,          )
                            )    Case No. 1631-CC00958
            Respondent.     )
                            )

\* \* \* \* \* \*

**POST-CONVICTION RELIEF HEARING**

Before the HONORABLE MICHAEL J. CORDONNIER,
Judge of Division I
Thirty-first Judicial Circuit
Greene County, Missouri

MAY 22, 2018

**A P P E A R A N C E S**

ATTORNEY FOR THE MOVANT-APPELLANT:

    MS. SUSAN A. FAUST
    Assistant Public Defender
    Woodrail Centre Building 7, Suite 100
    1000 West Nifong
    Columbia, MO 65203

            ATTORNEY FOR THE RESPONDENT:

                MS. EMILY L. SHOOK
                Assistant Prosecuting Attorney
                Greene County Judicial Facility
                1010 Boonville Avenue
                Springfield, MO 65802


        Reported by Tina R. Miller, CCR 1357

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 1 of 102

# I N D E X   T O   C O N T E N T S

**PAGE**

MOVANT-APPELLANT'S EVIDENCE:

**STUART P. HUFFMAN**
  Direct Examination by Ms. Faust       11
  Cross-Examination by Ms. Shook      39
  Redirect Examination by Ms. Faust   50

**JESSICA FITZPATRICK**
  Direct Examination by Ms. Faust       51
  Cross-Examination by Ms. Shook      56
  Redirect Examination by Ms. Faust   62

**JOHN DARNELL LEE**
  Direct Examination by Ms. Faust       63
  Cross-Examination by Ms. Shook      73
  Redirect Examination by Ms. Faust   83

**ALESHA DAVIS**
  Direct Examination by Ms. Faust       86

Movant Rests           93

Movant's Closing Statement     94

Certificate of Court Reporter   102

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 2 of 102

# I N D E X   T O   E X H I B I T S

|  |  | OFRD | RCVD |
|---|---|---|---|
| MOVANT-APPELLANT: |  |  |  |
| 1 | Trial Transcript | 12 | 12 |
| 2 | Brief of Appellant | 12 | 13 |
| 3 | Deposition transcript | 25 |  |
| 5 | Affidavit - Alesha Davis | 30 | 30 |
| 6 | Affidavit - Jessica Fitzpatrick | 35 | 35 |
| 70 | State's Trial Exhibit 70 | 27 |  |

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 3 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    TEVIN L. WILLIAMS  vs. STATE OF MISSOURI

2    Case No. 1631-CC00958

3    MAY 22, 2018

4    **POST-CONVICTION RELIEF HEARING**

5         On Tuesday, the 22nd day of May, 2018,

6    the above cause came on before THE HONORABLE

7    MICHAEL J. CORDONNIER, Judge of Division I,

8    Thirty-first Judicial Circuit, Springfield,

9    Missouri.

10                    * * * * *

11        (Court in session at 1:30 P.M.)

12        THE COURT:  This is Case

13   No. 1631-CC00958, entitled Tevin Williams, the

14   Movant, versus State of Missouri, the Defendant.

15   The Movant, Tevin Williams, appears in person and

16   with his attorney, Susan Faust.

17        The State of Missouri appears by Assistant

18   Greene County Prosecuting Attorney Emily Shook.

19   We are here today on the Movant's motion filed

20   pursuant to civil -- Criminal Rule 29.15, that is

21   the Defendant's amended motion for

22   post-conviction relief.

23        Just to put this in context, the Defendant

24   had a jury trial which resulted in a verdict of

25   guilty of assault in the first degree and armed

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    criminal action; that verdict was rendered by a

2    jury on September 4, 2014.  The matter proceeded

3    to sentencing, and on December 12, 2014, the

4    Defendant was sentenced to 25 years in the

5    Missouri Department of Corrections on the charge

6    of assault in the first degree and three years in

7    the Missouri Department of Corrections on the

8    armed criminal action, I believe, and those

9    sentences ran -- or are to run concurrently.

10        Subsequent to that, the Defendant pursued a

11    direct appeal to the Missouri Court of Appeals,

12    Southern District, and in Southern District Case

13    No. 33685, the Southern District affirmed that

14    conviction by mandate issued May 4, 2016;

15    subsequent to that, the Defendant filed his

16    motion pursuant to Rule 29.15; thereafter,

17    counsel was appointed and an amended motion was

18    filed.  So that's the matter upon which we are

19    here today.

20        Ms. Faust, before we begin, why don't I give

21    you a moment to give me a very short outline of

22    what you anticipate the evidence will be today.

23    I have read the amended motion that's been filed

24    on behalf of the Movant.

25        MS. FAUST:  Your Honor, I anticipate

5

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

 1    the evidence will be today that trial counsel,

 2    Stuart Huffman, failed to introduce really not

 3    the entirety of State's Exhibit 70, which is an

 4    interview by Chelsea Brashears, but failed to

 5    introduce at trial impeachment evidence showing

 6    that Chelsea Brashears had a motive to lie about

 7    Desmond Williams' and Tevin Williams' involvement

 8    in the crimes alleged.

 9        Chelsea Brashears was the only corroborating

10    witness to the complaining witness John Darnell

11    Lee, who was the only eyewitness to the shooting.

12    And his story has -- had shape shifted somewhat

13    and so his ID testimony was shaky at best.  The

14    majority of the evidence at trial really was John

15    Darnell Lee's testimony and Chelsea Brashears'

16    testimony.

17        And we believe that had Mr. Huffman

18    introduced this impeachment evidence, there is a

19    probable likelihood that a different outcome at

20    the trial would have been had.

21        We would further expect the evidence to be

22    that Alesha Davis, who is here to testify today,

23    should have been called; that Mr. Huffman was

24    aware of her existence and of her testimony and

25    that she had given an affidavit which would have

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 6 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    impeached Mr. John Lee's credibility as to his

2    definitiveness that it was Tevin Williams who

3    shot him on May 1st of 2013, as she had an

4    encounter subsequent to that event with Mr. Lee,

5    wherein he was demanding to know who shot him.

6    We also expect to adduce evidence from Jessica

7    Fitzpatrick today who was the girlfriend of John

8    Darnell Lee during the summer following this

9    shooting, and we expect her testimony to be that

10    he described to her that there was a white male

11    and a dark-skinned black male, which was

12    different than the description that he gave at

13    trial.

14    And we believe that she was also available

15    for trial, and she had given an affidavit to that

16    effect, and had Stuart Huffman investigated her

17    testimony and subpoenaed her for trial, she was

18    willing to appear.

19    We believe that these two witnesses would

20    have further called into question the

21    identification testimony of John Darnell Lee, and

22    that had these witnesses been called to testify

23    at trial, there is a reasonable likelihood that a

24    different outcome would have prevailed. And that

25    is, in essence, what we anticipate the evidence

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 7 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    to be today, Judge.

2            THE COURT:  Thank you, Ms. Faust.

3        Ms. Shook, are you able to give the Court an

4    outline of what you think the evidence will be,

5    or otherwise?

6            MS. SHOOK:  The State won't be

7    presenting a great deal of evidence given the

8    nature of this hearing, but I can give the Court

9    sort of an outline of my view of where things

10   stand.

11       I note that Ms. Faust did not mention all of

12   the claims that were in the Movant's amended

13   motion, and so I'm not sure if that's because of

14   an intent to abandon some of those following

15   today's hearing or just that they're not

16   presenting additional evidence and we'll rely on

17   the record for those.  But I will go through each

18   of them just really briefly.

19       First with regard to the claim that

20   appellate counsel failed to raise on direct

21   appeal the trial court's err of playing portions

22   of State's Exhibit No. 70 before the jury.

23   Exhibit No. 70 being Chelsea Brashears' interview

24   with law enforcement.  The State would just point

25   out to the Court that that entire claim relies on

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 8 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1   old law, and doesn't take into account the fact

2   that Missouri State statute inconsistent

3   statements, prior and consistent statements are

4   admissible at trial as substantive evidence and

5   we would submit to the Court that that evidence

6   was used properly by the State at trial.

7       With respect to Claim B, which is that trial

8   counsel failed to request the entirety of State's

9   Exhibit No. 70 be played, I think the Court will

10  find that there is not sufficient foundation for

11  that to have happened.  It's one thing to impeach

12  someone's statements with prior statements, but

13  it wouldn't have been proper for the Court to

14  have allowed the entirety of State's Exhibit

15  No. 70 to be played, following the testimony that

16  Chelsea Brashears actually gave at trial.

17      With regard to letter C, I expect that

18  Stuart Huffman, defense counsel in this case,

19  will testify that he is a very experienced

20  attorney, criminal defense attorney and also

21  trial attorney, and that every decision that he

22  made in this case with regard to what evidence

23  would be presented or would not be presented,

24  which witnesses would or would not be endorsed

25  was all strategic in nature.

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 9 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1       And finally with regard to letter D, just

2   that the evidence that was presented at trial

3   supports a finding that the motion to suppress

4   for use of allegedly tainted photo lineup would

5   not have been successful because that's argument

6   first impression is inconsistent with the

7   evidence that's already been presented and it is

8   in the record in this case.  So that's what I

9   expect the evidence and law will support at the

10  conclusion of the hearing.

11          THE COURT:  Thank you, Ms. Shook.

12      Ms. Faust, you may -- first off, are there

13  any witnesses here in the courtroom?

14          MS. FAUST:  Yes.

15          THE COURT:  Is it satisfactory to leave

16  them in the courtroom or do you wish to invoke

17  the rule?

18          MS. SHOOK:  I would ask for the rule on

19  witnesses, please.

20          THE COURT:  Okay, let's do that.

21          MS. FAUST:  Alesha and Jessica, you

22  will need to stay outside.

23          THE COURT:  Is Mr. Stuart going to be

24  the first witness?

25          MS. FAUST:  I was anticipating calling

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 10 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1  John Darnell Lee.

2  THE COURT:  You probably ought to talk

3  to Mr. Huffman.  He's only got so much time.

4  MR. HUFFMAN:  I'm not going to

5  interfere with Ms. Faust's strategy.  I told

6  Judge Blankenship in Stone County that I will be

7  running late.

8  THE COURT:  Okay.

9  (Pause in proceedings.)

10  THE COURT:  Ms. Faust, you may call

11  your first witness.

12  MS. FAUST:  I call Stuart Huffman.

13  THE COURT:  Mr. Huffman, if you would

14  raise your right hand.

15  **STUART HUFFMAN**, having been duly sworn by

16  the Court, testified as follows:

17  THE COURT:  Have a seat, please.

18  Ms. Faust, you may inquire.

19  <u>**DIRECT EXAMINATION**</u>

20  **BY MS. FAUST:**

21  Q.  Please state your full name.

22  A.  Stuart Paul Huffman.

23  Q.  And, sir, did you represent Tevin Williams

24  through the entirety of the pendency of the

25  criminal case underlying this post-conviction

11

```
 1      hearing today?
 2  A.  Yes.
 3  Q.  And at trial --
 4           MS. FAUST:  Well, Judge, may I backup
 5      for a minute?  One thing I did want to do prior
 6      to starting my questioning was I would like to
 7      offer and ask the Court to take judicial notice
 8      of the trial transcript in this cause.  And I'm
 9      offering that as Movant's Exhibit 1.
10           THE COURT:  Any objection?
11           MS. SHOOK:  No, Your Honor.
12           THE COURT:  Okay, the Court accepts as
13      evidence the trial transcript.  I believe it is
14      actually -- there is a copy in the file so you
15      can take your hard copy back.
16           MS. FAUST:  Okay.
17           THE COURT:  There is an electronic copy
18      that's been posted with the file.
19           MS. FAUST:  Okay.  And I would also
20      offer Movant's Exhibit 2, which is the brief of
21      appellant which goes to Claim 9(a), which Movant
22      is not abandoning, but will simply rely on the
23      trial transcript, rely on the appellate brief
24      regarding the claim of 9(a).  I would state that
25      I believe Ms. Shook is correct that this claim
```

12

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    does rely in large part on prior law, which has

2    been superseded by statute.  However, Movant

3    continues to maintain that the impeachment was

4    improper, as the witness was not confronted with

5    all of the statements that were played to impeach

6    her testimony at trial, and she was not asked as

7    to the truth of her statements, and so she was

8    not confronted with those, the truth or falsehood

9    of her statements, which I believe is still

10   required for proper impeachment by astringent

11   evidence.

12            THE COURT:  Okay.  As to the simple

13   offer of Movant's Exhibit 2, any objection?

14            MS. SHOOK:  No, Your Honor.

15            THE COURT:  Exhibit 2 is admitted.

16       You may expect, Ms. Faust, at the conclusion

17   of this hearing, we will review together which of

18   the claims you believe evidence has been

19   presented on, to make sure that we address all of

20   those in whatever order the Court chooses to

21   enter.

22       In the meantime, you have called a witness.

23   You may inquire.

24 Q.  (By Ms. Faust)  Now, Mr. Huffman, this case

25      involved Mr. Williams, who was charged as the

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  13 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1      Defendant with assault in the first degree; is
 2      that correct?
 3  A.  Yes, ma'am.
 4  Q.  And armed criminal action?
 5  A.  Yes, ma'am.
 6  Q.  And he was found guilty on both counts at his
 7      jury trial?
 8  A.  Yes, ma'am.
 9  Q.  Now, would you agree that the essential -- there
10      was one eyewitness to the event?
11  A.  Correct.
12  Q.  And that was John Darnell Lee?
13  A.  Yes.
14  Q.  And the only other witness that the state called
15      to corroborate Mr. Lee's testimony was Chelsea
16      Brashears?
17  A.  Correct.
18  Q.  And at the trial Chelsea Brashears denied that
19      she had ever -- well, let me backup.
20          The claim by your witnesses was that
21      Mr. Williams was at a party during the time of
22      the shooting?
23  A.  Correct.
24  Q.  And prior to trial, you had been present at the
25      State's deposition and I believe your own
```

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
1        deposition, two prior depositions of John Darnell
2        Lee's accounting of the events?
3   A.   Yes.
4   Q.   And were you aware that he had given various
5        different stories from the date of May 1st, 2013,
6        of the shooting, throughout those depositions, as
7        to whether or not he did indeed know or
8        recognized Tevin Williams?
9   A.   I had been told by both Mr. Williams and
10       Ms. Garrison that there were individuals within
11       the community that indicated that Mr. Lee was out
12       asking as to who shot him.
13  Q.   Okay.
14  A.   And so there was questions about that.  If I
15       remember correctly, there was even an Uncle Fred,
16       Fred Williams, I believe it may have been the
17       name, specifically was a name that I was
18       provided, that was specifically asked.
19  Q.   And specifically as to John Lee's identification
20       of his assailant, there was trial testimony by
21       Detective Kevin Shipley, if you recall, that John
22       Lee was interviewed the night of the shooting.
23            The shooting took place approximately
24       2:59 A.M. on May 1st?
25  A.   It was late morning.  I wouldn't -- without
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 15 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1     looking at the transcript, I can't remember the

2     exact time.  But it was very late in the

3     morning --

4  Q.  Okay.

5  A.  -- or early.

6  Q.  And there was quite some issue about whether John

7     Darnell Lee ever identified Tevin Williams at

8     that initial interview on May 1st.

9  A.  Correct.

10  Q.  And, in fact, the trial testimony from --

11     although John Darnell Lee denied it, the trial

12     testimony from Detective Shipley was that when he

13     went to interview John Darnell Lee prior to

14     surgery, that he never gave a last name of an

15     individual.

16  A.  Going from memory --

17          MS. SHOOK:  I would object to basically

18     this effort to paraphrase all of the trial

19     testimony.  I think that the trial testimony

20     speaks for itself and is already in the record.

21          THE COURT:  Okay.  That and the

22     objection to leading is sustained.

23  Q.  (By Ms. Faust)  So do you recall whether or not

24     during the trial John Darnell Lee stated that he

25     could identify Tevin Williams at the time of the

16

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 16 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1      shooting?
 2  A.  Could you rephrase that?  I'm sorry.
 3  Q.  Okay.  Is it true that the major issue in this
 4      case was the identification of John Darnell Lee
 5      of Tevin Williams as being the shooter?
 6  A.  Yes.
 7  Q.  And is it also true that you believe that would
 8      be critical in the outcome of the trial, the
 9      credibility of Mr. Lee?
10              MS. SHOOK:  Objection, leading.
11              THE COURT:  It's sustained.  You can
12      ask those questions without leading.
13  Q.  (By Ms. Faust)  Well, what do you believe
14      about -- do you believe --
15          What do you believe the jury would have done
16      or likelihood that the jury would have done if
17      they didn't believe John Lee's identification of
18      Tevin Williams?
19              MS. SHOOK:  Objection, calls for
20      speculation.
21              THE COURT:  Sustained.
22  Q.  (By Ms. Faust)  Well, do you believe it was
23      important, as the trial attorney, to impeach the
24      credibility of the complaining witness?
25              MS. SHOOK:  Objection, leading.
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 17 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1                THE COURT:  Overruled.
 2  A.  Absolutely.
 3  Q.  (By Ms. Faust)  And at the trial there was
 4      allowed to be played -- well, and backing up,
 5      Chelsea Brashears testified at trial, as you
 6      previously stated.
 7  A.  Correct.
 8  Q.  And over your objection, there were pieces of
 9      that interview of Chelsea Brashears played; is
10      that right?
11                MS. SHOOK:  Objection, leading.
12                THE COURT:  It's overruled.
13  A.  Correct.
14  Q.  (By Ms. Faust)  And you made no effort to
15      introduce the entirety of Chelsea Brashears'
16      videotaped interview; is that correct?
17  A.  That's correct.  I did not move for its
18      admission.
19  Q.  And why did you not move for its admission?
20  A.  There were statements contained within that were
21      both helpful and hurtful to Tevin Williams.  And
22      so at the time, as we were going through that, I
23      made a decision that I didn't want to bring out
24      some of the stronger points of her interview.  I
25      thought Chelsea didn't present very well at
```

                                                                18

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1    trial, and she came over, and if I remember
 2    correctly, in jail uniforms because she had been
 3    picked up the week before, and so I didn't feel
 4    with her testimony that I wanted to bring out
 5    statements that she had made in her interview
 6    that actually implicated Tevin.  I wanted to try
 7    and keep that out as much as we could.
 8                  MS. FAUST:  Judge, at this time I'd
 9    like to introduce the entirety of State's trial
10    Exhibit 70, which is the interview of Chelsea
11    Brashears on April 3rd, 2014.
12                  MS. SHOOK:  No objection.
13                  THE COURT:  And what is it marked?
14                  MS. FAUST:  It's marked Movant's
15    Exhibit 70.
16                  THE COURT:  Okay.  Movant's Exhibit 70
17    is admitted.
18 Q. (By Ms. Faust)  Now, so you made a discretionary
19    decision that you didn't want the entirety of her
20    interview played?
21 A. That's correct.
22 Q. However, in that interview --
23         Well, do you recall the substance of the
24    interview of Chelsea Brashears?
25 A. Obviously, it's been a long time.  I remember it
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 19 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1       was a jailhouse interview of her in connection

 2       with allegations that she was making that Tevin

 3       was at the party, had left the party, and that

 4       there were communications with the people there,

 5       and then what happened on communications upon his

 6       return --

 7   Q.  Okay.

 8   A.  -- after he had left.

 9   Q.  Okay.  And if you recall, did you believe there

10       were no portions of that testimony that were

11       helpful regarding impeachment of her credibility?

12   A.  Hindsight is 2020.  Looking back, obviously,

13       there are probably portions of the video that

14       could have been played that didn't necessarily

15       raise the concerns I had.  In the moment, I made

16       that decision.  Looking back, there are probably

17       some -- you know, after trial, you always think I

18       probably should have played more of the video.

19              MS. FAUST:  Judge, I'd like to play a

20       portion of Movant's Exhibit 70, which is

21       approximately the last three minutes of this

22       interview.

23              THE COURT:  You may.  The court

24       reporter is not going to take down these three

25       minutes that's part of the exhibit.
```

20

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 20 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1
 2                    (An excerpt of Movant's Exhibit 70
 3                    was played for the Court, but not
 4                    recorded.)
 5                 MS. FAUST:  Judge, I'm going to
 6       fast-forward this by, like, two minutes.  It was
 7       skipping.
 8                    (Resumed playing Movant's
 9                    Exhibit 70.)
10                 THE COURT:  Okay.  That complete the
11       part you wish to play from Exhibit 70?
12                 MS. FAUST:  Yes.
13                 THE COURT:  Okay.  You may continue
14       your questioning.
15  Q.   (By Ms. Faust)  Mr. Huffman, this interview took
16       place on April 3rd, 2014?
17  A.   I don't have any reason to dispute you.  That
18       sounds right.
19  Q.   Okay.  And that would have been approximately
20       13 months after the shooting incident?
21  A.   Yes.  The shooting took place sometime in 2013,
22       early, or late 2012.
23  Q.   And you had listened to the entirety of this CD
24       prior to trial?
25  A.   Yes.
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 21 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1   Q.   And when Chelsea Brashears is referring to Duzzy,

2        do you know who that is?

3   A.   Desmond.

4   Q.   That would be Desmond Williams?

5   A.   Yes, Desmond Williams.

6   Q.   And Desmond Williams, did he testify at trial for

7        the defense?

8   A.   He did.

9   Q.   And so in this interview you hear Chelsea

10       Brashears saying essentially that two days prior

11       to this interview Desmond Williams had been

12       sentenced over some issue between the two of

13       them?

14  A.   Correct.

15  Q.   And she indicates she's not so much afraid of

16       Duzzy, but the people he has do his dirty work?

17  A.   Correct.

18  Q.   And so is there a reason that you did not offer

19       that testimony of Chelsea Brashears to show a

20       motive for her to lie regarding Desmond and Tevin

21       Williams' involvement in this event?

22  A.   She didn't specifically name Tevin as a person

23       that was one of the people around.  Desmond, as

24       far as like one of the people that she would be

25       afraid of, and I didn't necessarily want to taint

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  22 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1      my own witness as well as Desmond Williams was my
 2      witness testifying on behalf of Tevin as well.
 3      So it was one of those fifty-fifty decisions that
 4      I decided that it was better not bringing that
 5      additional information in versus impeaching her
 6      with it.
 7   Q. Okay.  And as for John Lee's testimony,
 8      throughout his -- you listened --
 9          You read the police reports; correct?
10   A. I read all police reports, yes.
11   Q. And you were present at the two depositions, the
12      one in March and one July 14?
13   A. Yes, ma'am.
14   Q. July 16 of 2014?
15   A. Yes, ma'am.
16   Q. And do you recall John Lee making statements
17      about the color of the gun?
18   A. Not without referring to the deposition.
19   Q. I will hand you what's been marked as Movant's
20      Exhibit 1.  Can you identify that document?
21   A. Yes, ma'am.  This is a copy of a deposition,
22      State of Missouri v. Tevin Williams, deposition
23      of John D. Lee taken July 16, 2014.
24   Q. And was this actually the State's deposition of
25      John Lee?
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 23 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1  A.   Correct.  If I remember correctly, they were
 2       taking -- filed a motion to preserve testimony of
 3       Mr. Lee in case he was unavailable for trial.
 4  Q.   And would reviewing this deposition testimony
 5       refresh your recollection?
 6  A.   Yes, ma'am.
 7  Q.   I would refer you to page 14, lines 10 through
 8       12.
 9  A.   Yes, ma'am.
10  Q.   And does John Lee refer to the gun as a chrome
11       gun?
12  A.   He does.
13  Q.   And at trial do you recall whether or not John
14       Lee referred to the gun specifically as a chrome
15       gun?
16  A.   Specifically as a chrome, I don't believe he
17       referred to as a chrome.
18  Q.   Do you recall any definition?
19  A.   I don't remember chrome.  But I don't remember
20       definition, again, without looking at the
21       transcript.
22            MS. FAUST:  I would offer you Movant's
23       Exhibit 1 -- or Movant's Exhibit 2, I'm sorry.
24            THE COURT:  You've already got a 2 and
25       you've already got a 1.  You've identified two
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 24 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1        other things as 1 and 2.
 2                MS. FAUST:  Well, I think I have
 3        Movant's Exhibit 1 and 2.  And Movant's
 4        Exhibit --
 5                THE COURT:  Exhibit 1 was the
 6        transcript.
 7                MS. FAUST:  -- 70.
 8                THE COURT:  Exhibit 1 was the
 9        transcript.
10                MS. FAUST:  Right.
11                THE COURT:  Exhibit 2 and --
12                MS. FAUST:  Oh, I'm sorry, Judge.
13                THE COURT:  -- 3, start using 3 and 4
14        now.
15                MS. FAUST:  Yeah, Judge.  And it's 3.
16        So the deposition would be Movant's Exhibit 3.
17                THE WITNESS:  Okay.
18                MS. FAUST:  And Movant's Exhibit 4.
19                MS. SHOOK:  What is Movant's Exhibit 4?
20                MS. FAUST:  That is the transcript.
21                MS. SHOOK:  Of?
22                MS. FAUST:  Trial.
23                MS. SHOOK:  I have the trial
24        transcript --
25                MS. FAUST:  Judge, see, that's why I
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  25 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    thought -- can we take a moment and get the

2    exhibits straight because I thought I had offered

3    that.

4              THE COURT:  You did offer it as

5    Exhibit 1.

6              MS. FAUST:  As Exhibit 1.  Okay.  All

7    right.  So that's correct.

8    Q.  (By Ms. Faust)  So I'm handing you Movant's

9    Exhibit 1, that's the trial transcript, and I

10   would refer you to page 345.

11   A.  Yes, ma'am.

12   Q.  And would you review that testimony.

13   A.  Yes, ma'am.

14   Q.  And is that the testimony of John Lee at the

15   trial?  I believe his testimony starts on

16   page 276.

17   A.  Yes, ma'am.

18   Q.  And what does John Lee -- was he referring to the

19   gun in that testimony?

20   A.  Yes.

21   Q.  And how does he refer, if you could read that?

22   A.  He says, "I mean, it's obvious what type of gun

23   it was.  It was a .9 millimeter.  But I don't

24   remember telling him no.  I believe telling him

25   it's a chrome gun."

26

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 26 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1 Q. Okay. So there was evidence adduced at trial

2      that John Lee identified the gun as a chrome gun?

3 A. Yes.

4 Q. And at trial do you recall that Chelsea Brashears

5      denied seeing the gun whatsoever and that's why

6      the State was able to impeach her testimony with

7      State's Exhibit 7?

8 A. I believe that's correct. Yes, ma'am.

9          MS. SHOOK: I think it was State's

10     Exhibit 70 at trial.

11          MS. FAUST: 70.

12 Q. (By Ms. Faust) And in that exhibit that has been

13      admitted to the Court, she referred to the gun

14      specifically as a black handgun. Do you recall

15      that?

16 A. I mean, I don't have any reason to disagree with

17      that. The video speaks for itself. I can't

18      remember her specifically saying that. But the

19      video is the best evidence of that.

20          MS. FAUST: And Judge, I would ask the

21     Court to take judicial notice of State's trial

22     Exhibit 70. I believe that Ms. Shook has that.

23     I do not have a copy of that. But it is the

24     actual redacted testimony that was played from

25     this interview at trial. And I would like to

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
1    offer that.
2              THE COURT:  I think you did a moment
3    ago.
4              MS. FAUST:  Well, that was -- what I
5    offered was the entire interview.
6              THE COURT:  You did.
7              MS. SHOOK:  I think this is the entire
8    interview, and I may have said that incorrectly
9    before.  But looking at it, it is from one of the
10   detectives, Shipley.
11             MS. FAUST:  Okay.
12             MS. SHOOK:  So it must have been the --
13             MS. FAUST:  So that's not the --
14             MS. SHOOK:  -- portions of this were
15   played.
16             MS. FAUST:  -- redacted?
17             MS. SHOOK:  But this isn't redacted.
18             MS. FAUST:  I thought the State had a
19   redacted version that was played at trial.  So I
20   will withdraw that request.
21  Q.  (By Ms. Faust)  Now, are you familiar with Alesha
22      Davis?
23  A.  Yes, I remember Alesha Davis.
24  Q.  And who is that, that you recall her to be?
25  A.  Alesha was a friend of Tevin Williams.
```

28

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 28 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1  Q.  And had you spoken with Alesha Davis prior to

2      trial?

3  A.  Prior to trial I did, yes.

4  Q.  And do you recall, if anything, if she had

5      anything relevant to say?

6  A.  I believe -- the two things that I remember from

7      Alesha, one for sure that I remember, is that she

8      would have testified that later that evening that

9      she would have picked Tevin up and would have

10     dropped him off at his mother's house, Lisa

11     Garrison, in Springfield here.  And I thought she

12     was also one of the witnesses that had heard

13     either rumors or had heard that John Lee was

14     asking in the community as to who shot him.

15 Q.  I will hand you what's been marked Movant's

16     Exhibit 5.  Do you recognize that document?

17 A.  Yes, ma'am.

18 Q.  And what is that document?

19 A.  That is a notarized statement of Alesha Davis

20     dated the 17th of December, 2014.

21 Q.  And had you caused that affidavit to be made?  Or

22     how is it you recognize the document?

23 A.  This is a document -- anytime I have a witness

24     contact me about a statement, I request that they

25     actually get a notarized statement so that way

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1       it's a little bit more official because you are

 2       doing it in front of a notary.  And so this would

 3       have been a statement that either Alesha gave to

 4       me directly or it would have been dropped off by

 5       Ms. Garrison.

 6   Q.  Okay.  And this affidavit is dated December 17,

 7       2014?

 8   A.  Correct.

 9               MS. FAUST:  I'd offer Movant's

10       Exhibit 5.

11               THE COURT:  Any objection?

12               MS. SHOOK:  The only objection that I

13       would have is that I don't believe this was ever

14       provided as any form of discovery to the State

15       and it wasn't listed as something that Movant and

16       his counsel intended to rely on during the course

17       of this hearing.

18               THE COURT:  Okay.  I will admit the

19       exhibit and whatever additional evidence needs to

20       be presented with it.

21   Q.  (By Ms. Faust)  Now, Mr. Huffman, I will give you

22       a copy of Movant's Exhibit 5.  In that, Alesha

23       Davis gives you an affidavit, as you stated,

24       purporting, well, alleging and swearing that she

25       was with Mr. Williams on the night of May 1st,
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 30 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1  2013; correct?

2  A. Correct.

3  Q. And she also says that she drove Tevin Williams

4     home to his mother's house that night?

5  A. Yes.  She says she gave him a ride around 4 A.M.

6  Q. And beyond that, she declares that she had an

7     altercation with John Lee at the Dollar General

8     store?

9  A. That's correct.

10 Q. And the nature of that altercation was John Lee

11    trying to identify who his assailant was on

12    May 1st, 2013?

13 A. That's correct.

14 Q. And this took place subsequent to the shooting.

15    I don't know if she -- I mean, it would.

16 A. Right.  After the shooting, about a week after

17    the shooting is when Alesha indicated she was

18    approached by Mr. Lee.

19 Q. And you did not subpoena Alesha Davis for trial?

20 A. I did not.

21 Q. Did you intend on calling her at trial?

22 A. I did.  That was a mistake that I made.  Alesha,

23    I thought, was friendly.  I don't know to this

24    day why she didn't appear at trial.  We actually

25    tried contacting her during the trial, but I

31

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 31 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1   messed up and recognized that even a friendly

2   witness needs to be under subpoena, and so she

3   was not subpoenaed.

4  Q.   And as you said, at the time you would have

5   recognized that she should have been under a

6   subpoena; is that right?

7  A.   We fully anticipated her to testify.  I expected

8   her to be there when I was presenting my

9   testimony, but she was not.  Because I had not

10   subpoenaed her, I had no remedy at that point.

11  Q.   And are you familiar with the name Jessica

12   Fitzpatrick?

13  A.   I have looked.  I don't remember that name at

14   all.  I looked through my time entries.  That

15   doesn't mean that somebody didn't mention.  I

16   just don't have any independent recollection of

17   that name.

18  Q.   I will hand you what has been marked Movant's

19   Exhibit 6.  Do you recognize that document?

20  A.   Most likely I probably would have received both

21   at the same time.

22  Q.   Is that document that purports to be an affidavit

23   by a Jessica Fitzpatrick?

24  A.   Correct.  Ms. Fitzpatrick was subscribed and

25   sworn before a notary, Kaitlyn Wallace, the.

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 32 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1     same date in time ad nauseam, probably appears to

2     be the same type of notebook paper, on

3     December 17 of 2014.

4  Q.  Now, do you know who Kaitlyn Wallace is?  Is that

5     your notary?

6  A.  I do not know who Kaitlyn Wallace is, no.

7  Q.  Okay.  And so you gave to appellate counsel the

8     entirety of your physical file; is that right?

9  A.  Correct.  Our policy is to scan the file and then

10     the entire file, notes, everything, goes to the

11     appellate counsel.

12  Q.  And so as this was along with Alesha Davis, would

13     you be surprised that this was part of your file?

14  A.  No.  As soon as I saw the notary and the date, I

15     recognized -- I didn't remember the name, but the

16     document is probably a document that came out of

17     my file and went with appellate counsel.

18  Q.  Okay.  And this affidavit of Jessica Fitzpatrick

19     alleges that -- what?

20  A.  This is an affidavit that indicated that she was

21     his -- John Lee's girlfriend in the summer of

22     2013; that Mr. Lee had come home from the

23     hospital and stated that he didn't actually know

24     who attacked him; that it was a white boy that he

25     had met up with; and there was a dark-skinned guy

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 33 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    with a hat on that was there.  She claims in the

2    affidavit that John only gave the name he did

3    because a female bringing the name to him never

4    knowing if it was, and I assume that was if it

5    was actually Tevin Williams that shot Mr. Lee.

6 Q.  Now, you've stated earlier that you weren't --

7    you didn't specifically recognize the name

8    Jessica Fitzpatrick.

9        Does this document refresh your recollection

10   as to her?

11 A.  As far as her specifically, the name still is not

12   ringing a bell.  But the document is familiar

13   because, again, I guarantee I received these two

14   documents on the same date and time.

15 Q.  Okay.  And I'm not sure, only if you know, well,

16   did you subpoena Jessica Fitzpatrick to testify

17   at this trial?

18 A.  No, I did not.

19       Do you have the original?  Because we have

20   had it scanned.

21 Q.  This is what I have.

22 A.  Okay.  Basically why I was asking for

23   clarification is because policy -- and I don't

24   remember if this was before or after trial, we

25   actually marked "scanned" on every document that

1    comes in.  But this was in 2014, so we may not

2    have been scanning everything in at that point.

3    But like I said, Ms. Garrison, if she had brought

4    this in, she would bring it in at the same time.

5    She would have dropped it off at our office.  It

6    would have gone into the file.

7          Going back to your original question, did I

8    subpoena her?  No, I did not.

9  Q.  And today, do you have any known reason why you

10   would not have pursued an interview or testimony

11   and subpoenaed Jessica Fitzpatrick for trial?

12 A.  No.  I was probably told in advance of her

13   statement, had the statement written out, and I

14   would not have any sort of trial strategy or

15   reason as to why I wouldn't have called her to

16   the stand or testify or have her subpoenaed.

17 Q.  And do you agree this testimony would have gone

18   to impeaching the credibility of John D. Lee's

19   identification of Tevin Williams?

20 A.  Yes.

21          MS. FAUST:  Judge, I'd move to offer

22   Movant's Exhibit 6.

23          MS. SHOOK:  No objection.

24          THE COURT:  Exhibit 6 is admitted.

25 Q.  (By Ms. Faust)  Do you recognize the name Melvin

```
 1      Jackson?
 2  A.  I do recognize Melvin Jackson.
 3  Q.  And is he relevant -- did he have any relevant
 4      testimony to the defense in this case?
 5  A.  Yes, similar to the other people that we kind of
 6      talked about, Melvin was an individual who I had
 7      spoken to over the phone, confirming again that
 8      John Lee had told him specifically that he didn't
 9      know or that was trying to figure out who shot
10      him.
11  Q.  And did you subpoena --
12          Well, did you intend on calling Melvin
13      Jackson for trial?
14  A.  I did.
15  Q.  And did you call him?
16  A.  I did not.
17  Q.  And why not?
18  A.  Same mistake I made with Alesha Davis.  Melvin
19      had actually communicated with Lisa.  She and I
20      were actually trying to get ahold of Melvin
21      during the trial, but because I had not
22      subpoenaed Mr. Jackson I did not have any remedy.
23      And on the day that we were supposed to present
24      our testimony we couldn't get Mr. Jackson, ahold
25      of him, and so because I had failed to subpoena
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 36 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    him, I had to go forward with what I had.

2 Q. Okay.  So you anticipated that he would come

3    cooperatively and so you didn't subpoena him?

4 A. I spoken to him on the phone.  He had spoken with

5    the family.  We thought he would be there.

6 Q. And when you say you had -- Lisa had been in

7    contact with him, are you referring to Lisa

8    Garrison?

9 A. Ms. Garrison, yes, who is Tevin Williams' mother.

10 Q. Okay.  And the people --

11    Is it a fair statement to say that in

12    general, well, there were drugs involved in this

13    case?

14 A. Yes, absolutely.

15 Q. And that there was an issue about whether there

16    was some sort of drug dealing gone bad?

17 A. The entire issue is whether or not this was a

18    retaliation over stolen marijuana or drugs.

19 Q. Okay.  And so you have been practicing many years

20    in this area at the time of this trial; is that

21    right?

22 A. At the time of the trial it would have been

23    14 years.

24 Q. Okay.  And knowing that the case involved drug

25    dealing and people who knew John Lee, who was

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  37 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    involved with drugs or was on drugs at the time

2    of the shooting, you nevertheless trusted that

3    they would voluntarily appear, meaning Alesha

4    Davis, Jessica Fitzpatrick, and Melvin Jackson?

5  A.  I didn't have any information that necessarily

6    that Melvin or Alesha were involved in drugs.

7    For all I know they overslept, had the date

8    wrong. I don't know why they weren't there. But

9    I didn't subpoena them. So I don't have any

10    information that Alesha was on drugs or that

11    Melvin was on drugs.

12        Melvin, I was told, was a little unreliable

13    but not because of drugs; I think just in a

14    general nature. But, again, I don't think it was

15    drugs that were connected to their failure to

16    appear.

17  Q.  Okay. And you did call Desmond Williams?

18  A.  I did, yes. Desmond was present and testified.

19  Q.  And he was actually implicated by Chelsea

20    Brashears as being involved with giving Tevin

21    Williams the gun to go shoot John Darnell Lee?

22  A.  Yes. Chelsea specifically implicated Desmond as

23    an accomplice.

24  Q.  And did you have Desmond Williams under subpoena?

25  A.  I don't believe I had Desmond under subpoena. He

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 38 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    appeared voluntarily.

2  Q.  Do you know if you subpoenaed anyone to testify

3      on Mr. Williams' behalf?

4  A.  Without looking back to my files to see if there

5      was copies of subpoenas independently, I don't

6      remember subpoenaing anybody.  I think I was

7      under the impression that they would appear

8      voluntarily.

9          MS. FAUST:  Thank you.  I have no

10     further questions.

11         THE COURT:  Cross-examination,

12     Ms. Shook.

13         MS. SHOOK:  Yes, Your Honor.

14              **CROSS-EXAMINATION**

15  **BY MS. SHOOK:**

16 Q.  Mr. Huffman, when did you begin practicing law?

17 A.  2000.

18 Q.  And you've practiced continuously since that

19     time?

20 A.  Yes, ma'am.

21 Q.  Have you always practiced criminal law?

22 A.  80 percent to 90 percent of what I've done has

23     always been criminal law.

24 Q.  Aside from the trial of Mr. Williams, have you

25     tried other A and B felony cases?

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 39 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1  A.  Yes, ma'am.

2  Q.  Jury trials?

3  A.  Yes, ma'am.

4  Q.  Approximately how many other A and B felony jury

5      trials would you say you've done?

6  A.  If that includes unclassified felonies, 15-plus.

7  Q.  Have you also tried A and B felony bench trials?

8  A.  Yes.

9  Q.  Approximately how many?

10  A.  Probably 20-plus.

11  Q.  During the time that you've been practicing

12      criminal law, have you always subpoenaed every

13      witness you anticipated would testify at trial?

14  A.  No.  After this case I changed my policy to

15      subpoena everybody.  But up to this point I

16      didn't.

17  Q.  With regard specifically to Alesha Davis and

18      Melvin Jackson, did you do something to ensure or

19      to, I guess, assure yourself that they would

20      appear for Mr. Williams' trial?

21  A.  My understanding of Alesha, that she was very

22      supportive of Tevin.  She had been active in the

23      case.  She communicated with Lisa.  Lisa

24      communicated with me on a regular basis.  So I

25      took that to mean that she would show

40

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 40 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    voluntarily.  Melvin was probably a little bit
2    less reliable.  That was somebody that came along
3    a little bit later in the process, as far as his
4    information, and so, again, because of his
5    connection to Tevin, that he wasn't like a
6    stranger or anything, he was a supporter, I
7    thought he would appear.
8  Q.  And you communicated to them or had someone
9    communicate on your behalf the date of the trial?
10 A.  Yes.
11 Q.  And you believe that they understood when they
12   were supposed to be present to testify?
13 A.  I believe so, yes.
14 Q.  Did Lisa Garrison assist you in securing written
15   statements from Alesha Davis and Jessica
16   Fitzpatrick?
17 A.  I know Alesha was -- or I'm sorry, I know Lisa
18   was involved.  As far as whether she personally
19   went with him, I don't have any independent
20   knowledge.  I thought she was the one that
21   brought him to my office.  But I can't say she
22   went with him to do that.  I don't have any
23   independent knowledge of that.
24 Q.  What about with regard to Melvin Jackson, was
25   Lisa Garrison involved in securing information

41

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 41 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    about Melvin Jackson's anticipated testimony?

2  A.  Yes, Lisa was very involved in her son's case.

3  Q.  With regard to Alesha Davis, Jessica Fitzpatrick,

4      and Melvin Jackson, did you have concerns at any

5      time that Lisa Garrison was influencing the

6      content of their testimony?

7  A.  As far as influencing, it's hard to say.  Lisa is

8      passionate about her son's defense, and I think

9      that can be interpreted as pushy; it can be

10     interpreted in many different ways.  Nobody ever

11     told me that she was forcing them to lie or to be

12     untruthful.  And so while I had some concerns

13     about Alesha at one point, there was never

14     anything that I had solid that indicated that she

15     was willing to lie on behalf of Tevin.

16 Q.  Do you have any recollection, sitting here now,

17     as far as what connection there was between

18     Alesha Davis and Jessica Fitzpatrick?

19 A.  I don't.

20 Q.  But you testified earlier that based on the

21     appearance of Movant's Exhibit 5 and Movant's

22     Exhibit 6, that it appeared that the two

23     affidavits were written on the same paper and

24     were sworn on the same date before the same

25     notary; correct?

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  42 of 102

```
 1  A.  They were, yes.
 2  Q.  Okay.  The handwriting appears to be different?
 3  A.  The handwriting is different, yes.
 4  Q.  Okay.  But it certainly --
 5  A.  Signature.
 6  Q.  -- appears that these two women made these
 7      written statements together, or close in time?
 8  A.  At least close in time, that's all I can say.
 9  Q.  And I think earlier you agreed with Ms. Faust's
10      statement that Jessica Fitzpatrick was an
11      ex-girlfriend of John Lee?
12  A.  She was.  That was my understanding.
13  Q.  And at the time of this trial they were not
14      dating; is that right?
15  A.  To my knowledge, no.
16  Q.  Would you have had any concerns about calling a
17      witness's ex-girlfriend to testify about his
18      credibility?
19  A.  It depends on the circumstances.  This is a case
20      involving a client that wore a shirt that said
21      snitches something with ditches.  Right?  And so
22      you take your witnesses as they come.  And in
23      this particular case I probably would have called
24      her because specifically she could testify to one
25      specific issue in the case, which would have been
```

43

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1     beneficial to Mr. Williams.

2  Q.  You'll agree with me that you didn't file any

3      notice of an alibi?

4  A.  Yeah, I don't think I filed an alibi.

5  Q.  Not something that you would be required to do in

6      response to the State's discovery request?

7  A.  That's correct.

8  Q.  Okay.  Would you agree with me that the reason

9      that you didn't file a notice of alibi was

10     because -- although you intended to present some

11     evidence about Mr. Williams being at a party on

12     the night of the incident -- you actually weren't

13     able to account for all of his time on that

14     evening to preclude him from being able to commit

15     the offense?

16 A.  I mean, I think that's correct.  There was some

17     period of time at the party that I couldn't

18     account for.  We had pictures of him at the party

19     and witnesses.  But I think the not filing of the

20     alibi was more of an oversight than me not being

21     in a position where I could account for every

22     single moment of it.

23 Q.  You filed a response to the State's request for

24     disclosure where you endorsed Alesha Davis as a

25     witness?

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 44 of 102

1  A.   I did.

2  Q.   Okay.  And on that you included in the fifth

3       paragraph, and this is all in the Court's record,

4       that you did not intend to rely on a defense

5       alibi?

6  A.   I did.

7  Q.   Okay.  And then in your --

8            In another response to the State's request

9       for disclosures you endorse witnesses Desmond

10      Williams and Melvin Jackson?

11 A.   I did.

12 Q.   Okay.  And also on the same document endorsing

13      them in April of 2014, you state that the

14      Defendant did not intend to rely on a defensive

15      alibi?

16 A.   That's correct.

17 Q.   And then, finally, you filed a supplemental

18      response to the State's request for disclosures

19      endorsing Ivory Williams?

20 A.   Yes.

21 Q.   And on that, again, paragraph 5 indicates --

22      paragraph 4, I'm sorry, indicates that you did

23      not intend to rely on a defensive alibi at that

24      time?

25 A.   That's correct.

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 45 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1  Q.  So each of those times you specifically indicated
 2      to the State that you did not intend to present a
 3      defensive alibi?
 4  A.  As in the filing, yes.
 5  Q.  Would you agree with me that even if all of these
 6      witnesses had testified at trial -- Alesha Davis,
 7      Jessica Fitzpatrick, and Melvin Jackson -- in
 8      conjunction with all those witness who actually
 9      did testify at trial, you still wouldn't have
10      been able to account for all of Mr. Williams'
11      time on the night of the incident, thus proving
12      that he couldn't have committed the offense?
13  A.  Alesha would have testified, timewise, the most
14      important documents because of the offense took
15      place at 2:59, so while I couldn't account for
16      the entire night, I could account for the time of
17      the shooting, which was probably the most
18      critical time.
19  Q.  Because you would have called Alesha to testify
20      that she dropped the Defendant off at his
21      mother's house?
22  A.  Right.  She arrived at the party at 3 which is
23      shortly after, I think, the 2:59, and Tevin was
24      supposedly there, and then dropped him off, like,
25      an hour later.
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 46 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1  Q.   Did Lisa Garrison testify?

2  A.   At trial?

3  Q.   Yes.

4  A.   No.

5  Q.   But she could have testified, according to Alesha

6       Davis, that Alesha had dropped the Defendant off

7       at Lisa Garrison's house?

8  A.   Right, she could have testified to that.

9            Well, to be fair, as I think about that, she

10      dropped Tevin off at Lisa's, but I don't remember

11      if Lisa was up.  It was 4 in the morning.  So I

12      don't know if Lisa could have testified that she

13      was present and saw Tevin come in at 4.  I don't

14      recall that.

15 Q.   So then your recollection is that Alesha Davis

16      would have testified that she picked the

17      Defendant up at the party close in time to when

18      the shooting occurred and then took him to his

19      house approximately an hour later?

20 A.   No.  Alesha arrived at the party around 3 A.M.,

21      and the party was in full effect.  And the

22      shooting took place at, I believe, 2:59.  And so

23      Alesha would have testified for the hour that she

24      was there, from basically 3 to 4 Tevin was there,

25      so that would have accounted for the most

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 47 of 102

1     critical aspect of the timeline.

2  Q.  You testified that you felt like Chelsea Brashear

3     didn't present very well to the jury?

4  A.  Correct.

5  Q.  And you would agree with me that when she

6     testified she was actually in custody?

7  A.  She was.

8  Q.  And that was pursuant to the State's request for

9     a material witness warrant?

10 A.  Correct.

11 Q.  So there was already some information available

12     to the jury to suggest that she was not

13     cooperative with the prosecution of this case?

14 A.  It could be inferred whether -- we're not allowed

15     to tell them that.

16 Q.  And would you agree with me that that would have

17     been inconsistent then with trying to impeach

18     her, that she had a motive to lie with the

19     State's case because she was trying to get

20     someone else in trouble?

21 A.  At that moment she would have motive to cooperate

22     just to be released from jail.

23 Q.  Okay.  But it would be inconsistent for her to

24     refuse to appear in court and require a material

25     witness warrant if the whole reason why she

48

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1        wanted to testify was because she had an ulterior
 2        motive?
 3    A.  I don't have a good answer to that.  I mean, the
 4        reality is that people don't want to cooperate
 5        for lots of different reasons: They don't want to
 6        be involved; they don't like the State.  They
 7        don't like -- there are so many different reasons
 8        when you actually speak with people who aren't
 9        familiar with the justice system as to why they
10        don't want to cooperate.
11    Q.  Did you have Lisa Garrison or anyone from your
12        office go look for any of these witnesses during
13        the course of the trial?
14    A.  During the trial?
15    Q.  Yes.
16    A.  I didn't -- I don't think I --
17             Lisa was here during the entire trial.  I
18        know that we attempted to call.  But as far as
19        sending Ms. Garrison out to go find them, no, I
20        didn't request that she go look for them.  I
21        thought it was important for her to be here with
22        her son.  I did not ask my secretary or paralegal
23        to go look.
24    Q.  When you tried to call Alesha Davis and Melvin
25        Jackson, were you able to reach either of them?
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 49 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1   A.   No.

2                    MS. SHOOK:  Nothing further.

3                    THE COURT:  Additional direct exam?

4                    **REDIRECT EXAMINATION**

5        **BY MS. FAUST:**

6   Q.   Mr. Huffman, why didn't you do a notice of --

7        well, let me backup.

8             You just testified that Alesha Davis would

9        have accounted for the critical time period,

10       which was the shooting.  So Mr. Williams couldn't

11       have been at the shooting and at Desmond

12       Williams' jam session at the same time or within

13       60 seconds, so would that not be an alibi, in

14       your mind?

15  A.   It would.  It was an oversight.  It was a

16       mistake.

17                   MS. FAUST:  I have no further

18       questions.

19                   THE COURT:  Any further

20       cross-examination?

21                   MS. SHOOK:  No, Your Honor.

22                   THE COURT:  Mr. Huffman, thank you.

23                   THE WITNESS:  Thank you, Judge.

24                   THE COURT:  You may be excused.

25                   (Witness excused.)

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 50 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1              THE COURT:  Ms. Faust, you may call
 2     your next witness.
 3              MS. FAUST:  I call Jessica Fitzpatrick.
 4              THE COURT:  Are you Ms. Fitzpatrick?
 5              THE WITNESS:  Yes, sir.
 6              THE COURT:  Come right up here.  Raise
 7     your right hand.
 8          JESSICA FITZPATRICK, having been duly sworn
 9     by the Court, testified as follows:
10              THE COURT:  Have a seat, please.
11          Ms. Faust, you may inquire.
12                    DIRECT EXAMINATION
13     BY MS. FAUST:
14  Q.  Please state your full name?
15  A.  Jessica Fitzpatrick.
16  Q.  Ms. Fitzpatrick, do you live in Springfield?
17  A.  Yes, I do.
18  Q.  And in 2014 did you live in Springfield,
19      Missouri?
20  A.  Yes, I did.
21  Q.  And did you know -- do you know a John Darnell
22      Lee?
23  A.  Yes.
24  Q.  And did you know him in the spring of 2013?
25  A.  Yes.  He was my boyfriend.  He was my boyfriend
```

```
 1        at that time.
 2   Q.   Okay.  And did you two live together?
 3   A.   Yes.
 4   Q.   Did you live together at the time --
 5             He was shot; correct?
 6   A.   He moved in with me after he got shot.  After his
 7        release from the hospital.
 8   Q.   After he was released from the hospital?
 9   A.   Uh-huh.
10   Q.   And do you know approximately how long after he
11        was released from the hospital?
12   A.   The day he was released he came to my house
13        because I took care of him.
14   Q.   Okay.  And he is no longer your boyfriend?
15   A.   Huh-uh.
16   Q.   And when did you break up, approximately?
17   A.   About a year later, nine months or so.
18   Q.   Okay.  And while you were living with him, did he
19        make statements to you about the event of the
20        shooting?
21   A.   Yes.
22   Q.   And did you create an affidavit regarding the
23        statements that he made to you?
24   A.   Yes, I did, and I got it notarized.
25   Q.   And did you -- where did you have that statement
```

52

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    notarized?

2  A.   I believe Kinkos.

3  Q.   Okay.

4  A.   Kinkos does notary, I think.  It was a copy

5       place.  FedEx, Kinkos.

6  Q.   Okay.  And were you with Alesha Davis when you

7       went to the notary?

8  A.   I believe so.

9  Q.   Okay.  And how do you know Alesha?

10 A.   Just mutual friends.  I have lived here for a

11      long time.

12 Q.   Okay.  And how is it that you got together and

13      both went to the same notary?

14 A.   Just the -- I didn't know where to go to a

15      notary, so she did.

16 Q.   Okay.  Let me hand you what's been marked as

17      Movant's Exhibit 6.  Do you recognize that

18      document?

19 A.   Yes, ma'am.

20 Q.   And is that the affidavit --

21 A.   Yes.

22 Q.   -- that you signed?

23 A.   Yes, ma'am.

24 Q.   And that was on December 17 of 2014?

25 A.   Yes, ma'am.

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  53 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1   Q.   Now, were you still boyfriend/girlfriend with
2        John Lee then?  Or were you broken up?
3   A.   December of 2014, no, I believe we were broke up.
4   Q.   Okay.  And what did John Lee tell you about the
5        incident?
6   A.   That the night he was shot, he was at an
7        apartment.  He was getting high, and a white boy
8        called him and told him to come outside.  And I
9        don't know the guy's name.  But that the white
10       boy and then a dark-skinned black man with a hat
11       on, were who he saw, and then after that he got
12       shot and he took off running.
13  Q.   Okay.  And is that reflected in your affidavit,
14       that John Lee identified his shooter as either
15       the white boy or a dark-skinned black man?
16  A.   Yes, ma'am.
17  Q.   And did he ever name a name of who shot him to
18       you?
19  A.   No.  He told me he did not know.  That a female
20       had told him that she heard from somebody who
21       heard from somebody that it could have been
22       whoever.  He never really said he knew for sure
23       who shot him.
24  Q.   Okay.
25  A.   Never once.

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 54 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1  Q.  And if you recall, was this female someone that

2      he knew through Facebook or had seen Facebook

3      postings about?

4  A.  I can't really recall that.  If he knew her from

5      the streets or the internet.

6  Q.  Okay.  And do you have any other information, as

7      far as statements that John Lee made, regarding

8      whether or not he was able to identify the -- his

9      shooter?

10 A.  No.  I just know that he -- I know he said he did

11     not know.  He was high when it happened, on

12     cocaine.  He was not sure who shot him.  And that

13     he only said what he felt he was supposed to say

14     because he didn't want to get in trouble for the

15     drugs that he had on the night of him getting

16     shot.

17 Q.  Okay.  And when you made this affidavit, what did

18     you do with it?  Did you take it to the defense

19     lawyer's office?

20 A.  I believe I gave it to family to give to the

21     lawyer.

22 Q.  Okay.  And do you have an axe to grind against

23     John Lee today?

24 A.  No.

25 Q.  And is it your testimony that this affidavit that

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 55 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1      you filled out is the truth?
 2 A.   Yes, ma'am.
 3 Q.   Were you ever contacted by defense attorney
 4      Stuart Huffman?
 5 A.   No, ma'am.
 6 Q.   And are you under subpoena today?
 7 A.   Yes, ma'am.
 8           MS. FAUST:  I have no further
 9      questions.
10           THE COURT:  Cross-examination.
11                 CROSS-EXAMINATION
12 BY MS. SHOOK:
13 Q.   Are you currently on probation?
14 A.   Yes, ma'am.
15 Q.   For what?
16 A.   Stealing.
17 Q.   One case of stealing or more than one?
18 A.   No, I have more than one.
19 Q.   How many?
20 A.   Five, I believe.
21 Q.   Are those in Greene County or other counties or a
22      combination?
23 A.   Combination.
24 Q.   Okay.  In any of those cases do you currently
25      have a conviction?
```

56

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 56 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
1  A.   I have an SIS, so suspended.  I am in drug court.

2  Q.   When you said that you gave a copy of your

3       affidavit to someone in Mr. Williams' family, do

4       you recall who you gave it to?

5  A.   No.  Maybe --

6  Q.   Who in --

7  A.   -- his mom.

8  Q.   -- his family --

9       Probably his mom, is that what you said?

10 A.   Yeah.

11 Q.   And that would be Lisa Garrison?

12 A.   Yes, ma'am.

13 Q.   Was Ms. Garrison there with you when you wrote

14      out the affidavit?

15 A.   No, ma'am.

16 Q.   Was anyone there other than you and Alesha Davis?

17 A.   When I got it notarized?

18 Q.   Yes.

19 A.   Not that I can recall.  My kid.

20 Q.   And I assume the notary?

21 A.   Yeah.  My son might have been with me.  But it

22      was kind of a while ago.

23 Q.   How do you know Alesha Davis?

24 A.   Just through mutual friends.  I know a few people

25      in Springfield.  I've been here for a while.
```

57

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1  Q.  Were you friendly with Alesha Davis before John

2      Lee was shot?

3  A.  Yeah, I would say so, like an acquaintance.

4  Q.  Did you know Tevin Williams before John Lee was

5      shot?

6  A.  Kind of but not really.  Like, I know of him.  I

7      know him, but I never hung out with him.

8  Q.  You said that you believe that John Lee was told

9      by a female who it was that shot him?

10 A.  He said he had heard from a female that she had

11     heard.

12 Q.  Did he tell you that person's name?

13 A.  He didn't say the name, no.  He just said he had

14     heard that somebody knew who shot him but he

15     never actually told me who.

16 Q.  When did he tell you that?

17 A.  I don't know.  When we were living together.  I

18     couldn't tell you when.

19 Q.  You were living together from about the time of

20     the shooting until the end of December of 2014?

21 A.  Yeah.

22 Q.  Did he tell you when it was that that female

23     identified the shooter to him?

24 A.  No.  Usually when it came to other females, we

25     didn't get into a lot of detail.

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 58 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1  Q.  So do you have a belief that that other female
2      was someone that he had some sort of relationship
3      with?
4  A.  I'm not sure.
5  Q.  When you say that you and he didn't talk about
6      other females, did you have issues in your
7      relationship that related to other females?
8  A.  No.  We just didn't talk about that.  We weren't
9      together that long so it wasn't a thing.
10 Q.  It wasn't an exclusive relationship?
11 A.  I guess you could say that.
12 Q.  So then you are saying that you believe that he
13     was seeing other women socially or romantically
14     or intimately during the time that you were his
15     girlfriend --
16            MS. FAUST:  I am going to object.  It's
17     mischaracterizing the evidence.
18            COURT REPORTER:  One at a time.
19            THE COURT:  Okay.  It's overruled.
20 Q.  (By Ms. Shook)  Do you need me to repeat the
21     question?
22 A.  Yeah.
23 Q.  Okay.  So you are saying, during the time that
24     you were Mr. Lee's girlfriend, that he was seeing
25     other women socially, romantically, intimately,

59

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 59 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1       one of those things, and that you and he didn't
 2       talk about it?
 3   A.  I couldn't tell you if he was or wasn't because
 4       it wasn't a big deal if he was or wasn't.  I
 5       don't really feel like that was relevant.
 6   Q.  So why not talk about it?  When you said he
 7       didn't tell you who it was, but it was another
 8       female, I'm sort of understanding from that, or
 9       inferring from that, I guess, that the reason you
10       didn't talk about it was because that was an
11       off-limit topic in your relationship; is that
12       right?
13   A.  Or I just didn't care to ask.
14   Q.  So if it had been a male, you would have expected
15       to hear the name; but you didn't care about a
16       female name so you didn't expect to hear it?
17   A.  I probably didn't care if it was a male.  Our
18       relationship wasn't --
19   Q.  Wasn't what?
20   A.  It just wasn't -- I mean, it wasn't very
21       in-depth.
22   Q.  It wasn't serious?
23   A.  Not really.
24   Q.  So when Mr. Lee told you this about having
25       someone else give him a name of the person who
```

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1      shot him, he just identified that person
 2      generically as a female?
 3  A.  Yes.  On who told him?
 4  Q.  Yes.
 5  A.  Yeah.
 6  Q.  Was that the word he used?
 7  A.  Well, no, he said a bitch, a bitch told him.
 8  Q.  But he didn't tell you if it was someone he knew
 9      from before?
10  A.  No.  I mean, there would have been no reason for
11      him to just say that to me.
12  Q.  But he didn't tell you if it was someone he knew
13      from before?
14  A.  No, ma'am.
15  Q.  He didn't tell you where that conversation took
16      place?
17  A.  No, ma'am.
18  Q.  He didn't tell you how it was that she knew?
19  A.  No, ma'am.
20  Q.  And you don't recall when it was that she told
21      him?
22  A.  No, ma'am.
23  Q.  And you don't recall when it is that he told you
24      that she told him?
25  A.  No, ma'am.  Everything was in 2013 is when we
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 61 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1      lived together so that's the best I can give you.

2   Q.  How many times was he shot as a result of this

3       incident, if you know?

4   A.  I believe six.  He told me eight.  I only saw

5       maybe four wounds so I couldn't actually tell

6       you.

7   Q.  And during this time that you were living with

8       him, you were taking care of him?

9   A.  Uh-huh.  And we only took care of four wounds and

10      the colostomy bag that he had on his stomach.

11  Q.  But during this time when you were taking care of

12      him and taking care of his wounds, taking care of

13      his colostomy bag, he was also associating with

14      other women?

15  A.  I would assume so.  I don't know.

16              MS. SHOOK:  I don't have anything

17      further.

18              THE COURT:  Additional direct exam?

19              MS. FAUST:  Briefly.

20              **REDIRECT EXAMINATION**

21  **BY MS. FAUST:**

22  Q.  Has anyone threatened you to give your testimony

23      today?

24  A.  No, ma'am.  As a matter of fact, I volunteered.

25  Q.  Okay.  Did anybody threaten you or make any

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1       promises to you to create the affidavit you

 2       created back on December 17, 2014?

 3  A.   No, ma'am.

 4            MS. FAUST:  I have no further

 5       questions.

 6            MS. SHOOK:  Nothing further from the

 7       State.

 8            THE COURT:  You may step down.

 9            THE WITNESS:  Thank you.

10            (Witness left the stand.)

11            MS. FAUST:  I call John Lee.

12            THE COURT:  Mr. Lee, right over here.

13       Raise your right hand.

14       JOHN DARNELL LEE, having been duly sworn by

15       the Court, testified as follows:

16            THE COURT:  Ms. Faust, you may inquire.

17                 DIRECT EXAMINATION

18  BY MS. FAUST:

19  Q.   Please state your full name.

20  A.   John Darnell Lee.

21  Q.   And are you currently incarcerated in the Taney

22       County Jail?

23  A.   Yes, ma'am.

24  Q.   And, sir, back on May 1st of 2013, you were the

25       victim of a shooting; is that right?
```

                                                    63

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  63 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1  A.  Yes, ma'am.
 2  Q.  And did that shooting happen at approximately
 3      2:59 A.M.?
 4  A.  Yes, ma'am.
 5  Q.  And you were taken to the hospital?
 6  A.  Yes, ma'am.
 7  Q.  And did law enforcement or any police officers
 8      question you prior to --
 9          Well, you had surgery; is that right?
10  A.  Yep.
11  Q.  And prior to going into surgery did any law
12      enforcement official question you?
13  A.  Yeah.
14  Q.  And do you recall telling law enforcement that
15      you thought someone named Trey or Traevon had
16      shot you?
17  A.  Yes, ma'am.
18  Q.  And do you also recall telling law enforcement
19      that you did not know Tevin Williams at the time?
20  A.  Yep.
21  Q.  And, in fact, you then went into surgery and the
22      very following morning were interviewed again by
23      law enforcement; is that right?
24  A.  Yep.
25  Q.  You were still in the hospital?
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 64 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1   A.   Yes.

 2   Q.   And at that time you were shown a lineup; is that

 3        correct?

 4   A.   Yes, ma'am.

 5                  MS. FAUST:  Judge, may we approach?

 6                  THE COURT:  You may.

 7                  (Counsel approached the bench for

 8             a discussion off the record.)

 9   Q.   (By Ms. Faust)  I am handing you what's been

10        marked as Movant's Exhibit 7.  Are you familiar

11        with this document?

12   A.   Yeah, I've seen 'em before.

13   Q.   And that's the lineup that was shown to you the

14        morning after your surgery?

15   A.   (Nodded head up and down.)

16   Q.   And there is a circle here with your initials; is

17        that right?

18   A.   Yes.

19   Q.   And do you recall being --

20             Well, there was a deposition back in July of

21        2014?

22   A.   Yes, ma'am.

23   Q.   And do you recall indicating in that deposition

24        that the names were -- that Tevin Williams' name

25        was up under the photograph?
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 65 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1              MS. SHOOK:  Objection, improper
 2       impeachment.
 3              THE COURT:  I am going to overrule the
 4       objection.  You don't need to lead these
 5       witnesses.  You can ask the questions without
 6       leading them.
 7              MS. FAUST:  Okay.
 8              THE COURT:  That objection is
 9       overruled.
10  Q.   (By Ms. Faust)  Did you at a deposition tell
11       under oath -- say that you were shown the name of
12       Tevin Williams in the lineup?
13              MS. SHOOK:  Objection.  It misstates
14       the content of the deposition.
15              THE COURT:  And it is leading.  It's
16       sustained.  Let's see if we can ask one of these
17       witness's a non-leading question.
18  Q.   (By Ms. Faust)  Do you recall whether or not you
19       were shown a photo lineup with Tevin Williams'
20       name on it?
21  A.   Yes, ma'am.
22  Q.   And were you?
23  A.   You say a photo lineup?
24  Q.   Yes.
25  A.   Yeah, I believe they shown me a lineup.  I mean,
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  66 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1     a picture like what -- pictures, like, circled.

2     I mean, it was -- I mean, the same picture you

3     just showed me is the picture they showed me.

4  Q.  Let me hand you what's been marked Movant's

5     Exhibit A.  Do you recognize this lineup?

6  A.  Yeah, it's the same picture.  They had a circle

7     around his picture.

8  Q.  And was his name on the lineup?

9  A.  I don't remember that.  That was five years ago.

10    I don't remember that, ma'am.

11 Q.  So you don't remember whether or not his name was

12    on the picture?

13 A.  No, I don't remember that.  I don't remember

14    seeing that.

15 Q.  Or under the picture?

16 A.  No, ma'am.

17 Q.  But you believe that the name was already

18    circled?

19 A.  The picture -- I mean, I remember that picture.

20    They had his pictured circled.  Somebody marked

21    his picture.

22 Q.  Well, do you believe if you had the opportunity

23    to read the transcript of your deposition, that

24    may refresh your recollection?

25                MS. SHOOK:  Judge, I will object.  I

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 67 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    don't think that he testified about that at his

2    deposition.

3                THE COURT:  Well, I don't know the

4    answer to that.  He doesn't have a memory.  So if

5    you've got a document that can refresh his

6    recollection, you can consider that.

7                MS. SHOOK:  Can I see what you're going

8    to show him first?

9                   (Pause in proceedings.)

10               MS. SHOOK:  Yeah, that's not what that

11   says.

12               MS. FAUST:  Well, I can ask.

13               MS. SHOOK:  That's what you want it to

14   say, but that's not what that says.

15 Q.  (By Ms. Faust)  I'm handing you what's been

16     marked Movant's Exhibit 3, and can you read the

17     front of that?  Does that say "Deposition of John

18     Lee"?

19 A.  Yes, ma'am.

20 Q.  I will refer you to page 29 of the deposition,

21     and if you can just review page 12 -- or line 12

22     through 20.

23 A.  (Witness complying.)

24 Q.  And so after reviewing that, do you recall

25     whether or not you were shown a lineup with Tevin

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  68 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1     Williams' name on it?

2  A.  Yes, ma'am.

3  Q.  And what is your answer, were you?

4  A.  Would I show -- can you repeat that again?

5  Q.  Were you shown a lineup with Tevin Williams'

6     on it?

7          MS. SHOOK:  Judge, I'm going to object.

8     I think this is confusing for him -- to show him

9     prior testimony without any kind of context.

10         THE COURT:  It is sustained.  The only

11    reason to show him the testimony is to refresh

12    his memory.  You haven't asked him whether it

13    refreshes his memory, and then re-ask the

14    exact --

15         MS. FAUST:  Well --

16         THE COURT:  -- same question.

17 Q.  (By Ms. Faust)  Does that refresh your

18    recollection as to whether Tevin Williams' name

19    was on a photo lineup that you were seeing?

20 A.  Yes, ma'am.

21 Q.  And what is your answer, was it or not?

22 A.  I mean, I don't --

23         MS. SHOOK:  Judge, I'd ask her to

24    rephrase the question.  I think that's confusing

25    him.

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  69 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1              THE COURT:  Well, I'm going to
 2      overrule.  Let's see if he has an answer.
 3              THE WITNESS:  You are asking me if his
 4      name under his picture?
 5              MS. FAUST:  Yes.
 6              THE WITNESS:  I don't remember seeing
 7      his name under the picture.  I know they put a
 8      circle around his picture.  That's all I know.
 9  Q.  (By Ms. Faust)  Okay.  So your testimony today is
10      that the lineup showed a circle already around
11      Tevin Williams' picture?
12  A.  Yes, ma'am.
13  Q.  And your identification of Tevin Williams, was it
14      based on information that you learned after the
15      shooting?
16          In other words, did you learn information
17      that it was believed to be Tevin Williams who
18      shot you, after you were shot?
19  A.  Yes, ma'am.
20  Q.  And from what sources did you hear that it was
21      Tevin Williams?
22  A.  One of my close friends had told me.  I'm not
23      saying it was him, but -- and then one of my
24      people told me.
25  Q.  Okay.  And did someone come to you and tell you
```

70

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    that it was Tevin Williams very shortly after you

2    were shot?

3  A.  Yes, ma'am.

4  Q.  And did you -- do you know Alesha Davis?

5  A.  Yes, ma'am.

6  Q.  Did you have a confrontation or discussion with

7    her outside Dollar General store after you were

8    shot, if you recall?

9  A.  Yeah, yeah, I had a couple words with her.

10 Q.  And do you recall what the nature of that

11   conversation was?

12 A.  It was so long ago I don't even remember.

13 Q.  Okay.

14 A.  Not nothing major.  I mean, not nothing like

15   that.

16 Q.  Okay.  And did you -- when you --

17       You were in the hospital approximately a

18   week?

19 A.  Yeah, something like that.

20 Q.  And when you left, where did you go to stay?

21 A.  To one of my people's house.

22 Q.  Did you stay with Jessica Fitzpatrick?

23 A.  Well, not right out I got out of the hospital,

24   no.

25 Q.  Do you know approximately when you were staying

71

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 71 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
1        with her?

2   A.   2000 and -- I don't know, like, 2014, something

3        like that.

4   Q.   Okay.

5   A.   I think.  But I know it was, like -- it was,

6        like, a little while before I got my colostomy

7        bag reversed.  So whenever those things is.

8   Q.   And do you know --

9            Well, since you were shot, you've been shown

10       a photograph of Traevon Williams, is that true or

11       not?

12  A.   Since I've been shot?

13  Q.   Yeah.  After you were shot, had --

14  A.   After I've been shot.

15  Q.   -- anyone come to you with a photo?

16  A.   Have anybody?

17  Q.   Yeah, anyone.  Law enforcement or anyone shown

18       you a photo?

19  A.   The same detectives that shown me the picture the

20       first time.

21  Q.   And who is Traevon Williams in relation to Tevin

22       Williams, do you know?

23  A.   Who is he?  I guess it's his brother, I guess,

24       yeah.

25  Q.   And have you ever indicated to people that the
```

72

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  72 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1      two of them look alike?

2  A.  Have I?

3  Q.  Uh-huh.

4  A.  I don't even really know them like that for real

5      for real.  I mean, I don't -- that was five years

6      ago.  I mean -- I mean, I don't remember telling

7      nobody they look -- they do look alike, you know

8      what I'm saying.  I look just like my brother

9      too.  But I don't remember it.

10 Q.  Okay.  And just, finally, did you know Tevin

11     Williams prior to being shot?

12 A.  No.

13              MS. FAUST:  I have no further

14     questions.

15              THE COURT:  Cross-examination,

16     Ms. Shook.

17                 **CROSS-EXAMINATION**

18 **BY MS. SHOOK:**

19 Q.  Mr. Lee, you testified at the original trial in

20     this case?

21 A.  Yes, ma'am.

22 Q.  And at that time when you testified, did you tell

23     the truth?

24 A.  Yes, ma'am.

25 Q.  Okay.  Would it be fair to say that your

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 73 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1   recollection at the time of the trial was

2   probably fresher, as far as what had happened,

3   than it is sitting here today?

4 A. Yes, ma'am, yeah.

5 Q. Okay. I'm going to show you what's been marked

6   as Movant's Exhibit No. 7; this is the same as

7   what was State's Exhibit No. 66 at the original

8   trial. Here on the back of this it has a list of

9   photo lineup instructions; right?

10 A. Yep.

11 Q. And would you agree with me that the law

12   enforcement officer who showed you this lineup

13   went over those instructions with you before you

14   did the lineup?

15 A. Yes, ma'am.

16 Q. Okay. And he told you that he was going to ask

17   you to look at a group of photos?

18 A. (Nodded head up and down.)

19 Q. Is that yes?

20 A. Yes, ma'am.

21 Q. And the fact that the photos were shown to you

22   were not supposed to influence your judgment in

23   any way?

24 A. Yes, ma'am.

25 Q. He told you not to conclude or guess that the

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 74 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    photographs contain the picture of the person who

2    committed the crime against you?

3 A.  Yes, ma'am.

4 Q.  And he said that if you recognize someone in the

5    photo, to tell the officer how you recognize

6    them?

7 A.  Yes, ma'am.

8 Q.  That you weren't obligated to identify anybody?

9 A.  Yes, ma'am.

10 Q.  Okay.  And you've signed that you agreed with

11    those things as well as the other instructions on

12    this form; right?

13 A.  Yes, ma'am.

14 Q.  Did you follow those instructions to the best of

15    your ability when you did the lineup?

16 A.  Yeah, I did.  But, I mean, I was under the

17    influence of medication at the time.

18 Q.  Okay.

19 A.  You know what I'm saying.  So, I mean, I think

20    they had a lot -- they could have a lot to do

21    with this.

22 Q.  That could have a lot to do with why you don't

23    remember it very well?

24 A.  Yeah.

25 Q.  But at the time do you recall that you were

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 75 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1      trying to follow the instructions?

2  A.  Yeah.

3  Q.  And then on the other side of this, we see six

4      photographs and one of the photos is circled;

5      correct?

6  A.  Yes, ma'am.

7  Q.  Do you recall whether you did that, made that

8      circle, or if an officer circled that?

9  A.  Yeah, I did that circle.

10 Q.  You made that circle?

11 A.  Yes, ma'am.

12 Q.  And are these your initials?

13 A.  Yes, ma'am.

14 Q.  Who made those initials?

15 A.  I did.

16 Q.  Why did you circle this photo and make those

17     initials next to this photo?

18 A.  Because I thought that was the guy who shot me.

19 Q.  Okay.  You recognized that as being the person

20     who shot you?

21 A.  Yeah.

22 Q.  Okay.  This separate document that you were

23     shown, I think you testified earlier that it

24     appeared the same to you as Movant's Exhibit

25     No. 7.  You thought Movant's Exhibit 8 and

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 76 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    Movant's Exhibit 7 looked the same; right?

2 A.  Yeah.

3 Q.  And that's because they have the same six

4    photographs?

5 A.  Yes, ma'am.

6 Q.  But Movant's Exhibit No. 8 has names under the

7    photos.

8 A.  Yes, ma'am.

9 Q.  Movant's Exhibit No. 8 is not the set of photos

10   that you viewed and circled the one identifying

11   that as being the person who shot you; right?

12 A. Say what?

13 Q.  Movant's Exhibit No. 8, this one with the names

14   under the photos, that's not the same set of

15   pictures that you saw where you identified the

16   Defendant as the person who shot you?

17 A.  No, ma'am.

18 Q.  Okay.  Did you see one photo lineup or two photo

19   lineups at the hospital?

20 A.  I swear I can't remember.

21 Q.  Okay.

22 A.  That was so long ago.  I don't remember.  It

23   might have been just -- I don't know.

24 Q.  Okay.  But you know that you saw Movant's Exhibit

25   No. 7 because you remember getting those

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 77 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1        instructions and then circling this photo of the
 2        Movant and -- or he was called the Defendant at
 3        the original trial, and putting your initials on
 4        there; right?
 5   A.   Yes, ma'am.
 6   Q.   And that's because that's the guy who you saw
 7        shoot you?
 8   A.   Yeah.
 9   Q.   Okay.  After you were released from the hospital,
10        you said you went home to live?
11   A.   Yeah, I went to my people's house, yes.
12   Q.   To your people's house?
13   A.   Yeah.
14   Q.   Whose house was that?
15   A.   A friend of mine.
16   Q.   Do you recall who the friend was?
17   A.   Her name was January.
18   Q.   January?
19   A.   Yeah.
20   Q.   Was she a girlfriend or just a friend?
21   A.   She was just a friend.
22   Q.   Okay.  Did Jessica Fitzpatrick also live there?
23   A.   No.  She stayed -- stayed somewhere else.  I
24        didn't stay with her, like, it was two different
25        house.
```

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1  Q.   When you were staying with Jessica Fitzpatrick,
2       that wasn't at January's house?
3  A.   No.  That was, like, probably, about a year after
4       that, or something.  I don't remember, like, the
5       exact date, but it was, like, eight months after
6       that.
7  Q.   Okay.  So would it surprise you to hear that
8       Jessica Fitzpatrick testified that when you got
9       out of the hospital you went and lived with her?
10 A.   Would it surprise me?
11 Q.   Yes.
12 A.   No, it doesn't surprise me.
13 Q.   It doesn't surprise you because that's true?  Or
14      it wouldn't surprise you if she said something
15      that wasn't true?
16 A.   She say I got out of the hospital I, like, moved
17      in with her?
18 Q.   Yes.
19 A.   That ain't true.
20 Q.   And you said that that wouldn't surprise you if
21      she said something that wasn't true?
22 A.   I mean, no, ma'am, it wouldn't surprise me.  I
23      mean, I don't know.  I don't -- yeah.
24 Q.   Do you know Jessica Fitzpatrick to be a dishonest
25      person?

79

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 79 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1                MS. FAUST:  Objection.
 2   A.   Yeah.
 3                THE COURT:  It's overruled.
 4   A.   Yep.
 5   Q.   (By Ms. Shook)  How long were you and Jessica
 6        Fitzpatrick in a relationship?
 7   A.   Not long.  Probably about seven, eight months.
 8        Nothing major.
 9   Q.   And during that time period were you and she
10        exclusive?
11   A.   Exclusive?
12   Q.   Meaning, did you only see each other?  Or did you
13        also see other people?
14   A.   I'm pretty sure, um, yeah, she got a -- she
15        always had a little boyfriend, a little dude she
16        had been with for years.  Yeah, I'm pretty sure
17        she was seeing other people.
18   Q.   Were you seeing other people?
19   A.   To be honest with you, no.  Nope.
20   Q.   When you and Jessica Fitzpatrick stopped being in
21        a relationship with each other, were you on good
22        terms or bad terms?
23   A.   Good terms.
24   Q.   Okay.  Sitting here today, would you consider
25        yourself to be in good or bad terms with her?
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 80 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1  A.  For what I just heard, bad terms.

2  Q.  So it would concern you if she was dishonest

3      about that?

4  A.  Yes, ma'am.

5  Q.  Okay.  But otherwise, before today, you felt that

6      you and she were on good terms?

7  A.  Actually, I seen a picture so it was just -- we

8      ain't on no good terms.

9  Q.  Okay.  Did you ever have a conversation with

10     Jessica Fitzpatrick where you told her that it

11     was a white boy who shot you and that he was

12     there with a dark-skinned guy with a hat on?

13 A.  No, ma'am.

14 Q.  So if she said that, she's not telling the truth?

15 A.  She's not telling the truth.  I don't know where

16     she got that from.

17 Q.  Did you ever tell Jessica Fitzpatrick or anyone

18     else that you only gave the names that you did to

19     law enforcement because of a female who brought

20     the name to you?

21 A.  No, ma'am.  That was five years ago, but I don't

22     remember.  I used to have a lot of discussion

23     about that.  I talked to my immediate family, but

24     I didn't talk to nobody, you know what I'm

25     saying, like that, about what was going on.  I

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 81 of 102

1      don't like talking about it.

2  Q.  Did you talk to Jessica Fitzpatrick about who it

3      was that shot you?

4  A.  No, ma'am.  I don't remember.  We might've had

5      some discussions, you know what I'm saying,

6      because I was staying with her in whatever type

7      relationship, but I really don't remember.

8  Q.  Are you familiar with Alesha Davis?

9  A.  I mean, I just know her mom, for real.

10  Q.  You know Alesha Davis' mother?

11  A.  Yeah.

12  Q.  Who is --

13  A.  I know --

14  Q.  -- that?

15  A.  -- her a little bit but I know her mom.  Her mom

16      named Renee Moore.

17  Q.  Were Alesha Davis and Jessica Fitzpatrick friends

18      to your knowledge?

19  A.  I never knew they were 'til just now.

20  Q.  And you already testified that you didn't know

21      the Movant, who was a Defendant at the trial;

22      right?

23  A.  Yes, ma'am.

24  Q.  Okay.  And before all this happened, you didn't

25      know his brother either?

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  82 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1  A.  No, it was the kid.  I don't know.

2            MS. SHOOK:  I don't have anything

3      further.

4            THE COURT:  Additional direct exam?

5                **REDIRECT EXAMINATION**

6      **BY MS. FAUST:**

7  Q.  Regarding Jessica Fitzpatrick, when did you stay

8      with her?

9  A.  I don't remember the exact month, ma'am.

10 Q.  Do you remember if it was during the summer

11     months of 2013?

12 A.  Did she tell you, like, when we stay together?

13     Because I really don't know.

14 Q.  Okay.  You don't know?

15 A.  I really don't know.

16 Q.  Do you recall if you had your colostomy bag at

17     that time?

18 A.  Yes, ma'am.

19 Q.  And did you?

20 A.  Yes, ma'am.  Yep.

21 Q.  And you had your --

22            Approximately how long did you have the

23     colostomy bag?

24 A.  Probably about -- I don't even remember.

25     Probably about six months or something like that.

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  83 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1   Q.  Okay.  But it was -- and it was removed after
 2       that?
 3   A.  Yeah, it was removed.
 4   Q.  Did you feel pressured by law enforcement to
 5       identify Tevin Williams as the person who shot
 6       you?
 7   A.  To be honest with you, I was so -- I was so,
 8       like, medicationed up, drugged up, I don't
 9       remember.  I just wanted to go to sleep at the
10       time.  Dang, nobody pressured me to do nothing.
11       I seen law enforcement, like, one time, like,
12       after that.  Like, when I woke up from surgery or
13       whatever, I don't remember even seeing them no
14       more after that.
15   Q.  Earlier you testified that you had heard
16       information on the street about who shot you;
17       right?
18   A.  On the street, yes, ma'am.
19   Q.  Is that right?
20   A.  Yes, ma'am.
21   Q.  And is it after you heard the information on the
22       street that it was Tevin Williams that shot you,
23       that you became convinced he was the shooter?
24   A.  I mean -- yes, ma'am, until, like, the
25       altercation happened, you know.
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 84 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1  Q.  Okay.

2  A.  But that's -- yeah, I heard that.

3  Q.  And are you referring to an altercation between

4      yourself and Trae Williams?

5  A.  What?

6  Q.  You said until the altercation happened?

7  A.  Yeah.

8  Q.  Were you referring --

9  A.  Until I ended up getting shot that night, like a

10     little fistfight or whatever.

11          MS. FAUST:  I have no further

12  questions.

13          THE COURT:  Ms. Shook?

14          MS. SHOOK:  Nothing further.

15          THE COURT:  Mr. Lee, thank you.  You

16  may be excused.

17          (Witness excused.)

18          MS. FAUST:  May I have a moment?

19          THE COURT:  You may.

20          (Pause in proceedings.)

21          THE COURT:  Ms. Faust, you have a

22  witness?

23          MS. FAUST:  Call Alesha Davis.

24          THE COURT:  Alesha Davis, right over

25  here, please.

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  85 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    **ALESHA DAVIS,** having been duly sworn by the

2    Court, testified as follows:

3         THE COURT:   Have a seat, please.   Kind

4    of adjust that microphone to fit you.   Ms. Faust

5    is going to ask you some questions.

6              **DIRECT EXAMINATION**

7    **BY MS. FAUST:**

8    Q.   Please state your full name.

9    A.   Alesha Davis.

10   Q.   And do you reside in Springfield, Missouri?

11   A.   Yeah.

12   Q.   Where did you reside back in the spring of 2013?

13   A.   Springfield.

14   Q.   And in 2014?

15   A.   Springfield.

16   Q.   I mean, have you continuously resided?

17   A.   Uh-huh.

18   Q.   Okay.  And do you know Tevin Williams?

19   A.   Yeah.

20   Q.   And how do you know him?

21   A.   He's my cousin.

22   Q.   Okay.  On your mother or your father's side?

23   A.   Father.

24   Q.   Who is your father?

25   A.   Jimmy Davis.

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  86 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1 Q. Okay. And do you know Desmond Williams?

2 A. Uh-huh.

3 Q. Were you at Desmond Williams' mother's residence

4     on May 1st of 2013?

5 A. Yes.

6 Q. And what were you doing there?

7 A. They were having a party so I was just stopping

8     in for the party.

9 Q. Did people refer to it as a jam session or do you

10     know?

11 A. I don't know what they referred it to. But

12     that's what it was, a party.

13 Q. Okay. And if you recall, do you recall

14     approximately how many people were at the party?

15 A. Maybe, like, 20-plus.

16 Q. And at some point did you learn that John Lee had

17     been shot?

18 A. That was, like, I seen John Lee at Dollar General

19     and he kind of, like, blocked my car in and

20     that's when I learned he was shot. He told me

21     himself.

22 Q. What Dollar General was that?

23 A. On Commercial Street here in Springfield.

24 Q. And approximately when was that, as far as the

25     date and time?

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 87 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1  A.  It was about, like -- I don't recall the exact
 2      date or time, but it was about a week or so after
 3      he was shot.
 4  Q.  Okay.  So how do you know that?  How do you know
 5      it was about a week or so after he was shot?
 6  A.  Because he was bandaged and he was not in the
 7      hospital.
 8  Q.  Oh, I see.
 9          But you had not heard of the shooting prior
10      to that time?
11  A.  Not like -- I wasn't, like, concrete hearing of
12      it.  Like, through town, yeah.  But no one
13      physically came up to me and said John Lee was
14      shot.
15  Q.  Okay.  Had you heard that anybody was accused of
16      shooting him at that time when John Lee
17      confronted you?
18  A.  When he confronted me, he asked me who shot him.
19      And I told him I didn't know.  But he didn't say
20      a specific person shot him.  He just asked me who
21      it was that shot him.
22  Q.  And how is it that you know John Lee?
23  A.  He used to date my mom.
24  Q.  So were you -- so did you --
25          Had you heard anything about who was accused
```

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 88 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1        of shooting him at that time?
 2  A.    No, not necessarily.
 3  Q.    And did you at some point after that write an
 4        affidavit?
 5  A.    A statement, yeah.
 6  Q.    I'll hand you what's been marked Movant's
 7        Exhibit 5.  Do you recognize that document?
 8  A.    Yeah.
 9  Q.    And what is this document?
10  A.    It's a statement I wrote.
11  Q.    Okay.  And in this statement do you indicate that
12        you were confronted by John Lee?
13  A.    Correct.
14              MS. SHOOK:  Judge, I will object to
15        reading the statement in through this witness and
16        it's hearsay.
17              THE COURT:  The objection is overruled.
18  Q.    (By Ms. Faust)  And so why did you write this
19        statement?
20              I mean, did someone ask you to write this
21        statement, or what caused you to write this
22        statement?
23  A.    Tevin's lawyer asked -- after, like, I explained
24        what happened, he asked me to write the statement
25        and account what happened, whenever I encountered
```

89

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 89 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1          John at Dollar General.

2   Q.   Okay.  And taking you back to the party that was

3          on May 1st, in your statement you also indicated

4          that you arrived at that party very late; is that

5          right?

6   A.   Yeah.

7                    MS. SHOOK:  Objection, leading.

8                    THE COURT:  Okay.  Objection is

9          overruled.  But let's not lead any further than

10         this.

11  Q.   (By Ms. Faust)  Do you recall what you -- when

12         you said you arrived at the party?

13  A.   Correct, yeah.

14  Q.   And when was that?

15  A.   It was around 3 A.M.  The party was already going

16         when I got there.

17  Q.   And how would you know that it was at 3 A.M.?

18  A.   Because I was coming from somewhere else and it

19         was, like, 2:30.

20  Q.   I'm sorry.  Was 2:30 when you left?

21  A.   It was 2:30 when I left, where I was originally

22         coming from, and then about the time I got across

23         town it was, like, 3 A.M.

24  Q.   Okay.  And when you arrived was Tevin Williams

25         present?

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  90 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
 1  A.  Correct.
 2  Q.  And did you ever leave the party -- well, what
 3      did you --
 4          When did you leave the party?
 5  A.  I was there for maybe an hour.  So, and, as I was
 6      leaving, Tevin asked me to take him home because
 7      it was on the route that I was going.
 8  Q.  Do you know what time that was?
 9  A.  Maybe, like, 3:45, 4 A.M.
10  Q.  And where did you take him?
11  A.  To his house on Division.
12  Q.  So between the time you arrived at Desmond
13      Williams' house at approximately 3 A.M. to 3:45,
14      4 A.M., did you ever leave Desmond Williams'
15      home?
16  A.  No.
17  Q.  And did you see Tevin Williams leave at all?
18  A.  No.  He left with me at the end when I was going
19      home.
20  Q.  And did you notice anything unusual about Tevin
21      Williams in his demeanor?
22  A.  No.
23  Q.  And did you take pictures at the party?
24  A.  I don't have pictures, no.
25  Q.  Okay.  And were you drinking at the party?
```

91

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 91 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1   A.   Somewhat, yeah.

2   Q.   And were you intoxicated?

3   A.   No.

4   Q.   And were you doing any controlled substances?

5   A.   No.

6   Q.   And on the affidavit that you signed was

7       everything that you said in that affidavit true?

8   A.   Correct.

9   Q.   And do you recall who else was at the party,

10      people?

11   A.   I can't recall everyone, but it was a bunch of --

12      it was a lot of people there.  I could name a

13      couple people if you want, but I can't recall

14      every single person that was there.

15   Q.   Have you seen John Lee since this altercation at

16      the Dollar General?

17   A.   In passing, yeah.

18   Q.   Have you had any conversations with him?

19   A.   No.

20   Q.   Did anybody -- are you under subpoena today to be

21      here?

22   A.   No.

23   Q.   So you came voluntarily?

24   A.   Yeah.

25   Q.   Has anybody promised you or threatened you to get

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 92 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1       you to say anything that isn't true here today?

2   A.   No.

3             MS. FAUST:  I have no further

4       questions.

5             THE COURT:  Cross-examination?

6             MS. SHOOK:  I don't have any questions.

7             THE COURT:  Ms. Davis, you may step

8       down.

9             (Witness excused.)

10            MS. FAUST:  Movant rests.

11            THE COURT:  Very well.

12        Ms. Shook, will the State have evidence it

13      wishes to present?

14            MS. SHOOK:  I don't have any evidence.

15      I do have some things that I would like the Court

16      to take judicial notice of.

17            THE COURT:  It sounds like evidence to

18      me.  What would that be?

19            MS. SHOOK:  Well, I mean, I'm not going

20      to call any witnesses or present any exhibits.  I

21      would ask the Court to take judicial notice of

22      1331-CR01762-01.

23            THE COURT:  The underlying criminal

24      case?

25            MS. SHOOK:  It is.

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

```
1            THE COURT:  Any objection?

2            MS. FAUST:  No.  I believe it's already

3       in evidence.

4            THE COURT:  Okay.  Judicial notice will

5       be taken of that Greene County case file.

6            MS. SHOOK:  And I would also ask that

7       the Court take judicial notice of the entire

8       contents of the appellate case filed, which is

9       Appeal No. SD33685.

10           THE COURT:  Any objection?

11           MS. FAUST:  No.

12           THE COURT:  The Court will take notice

13      of that.  If there is something specific in that

14      case file you need for the Court to review, we

15      need to talk about that perhaps after the close

16      of this case to make sure I have that available

17      to me.

18           MS. SHOOK:  I don't have anything

19      further.

20           THE COURT:  Okay.  Ms. Faust, do you

21      wish to make a final remark?

22           MS. FAUST:  Very briefly, Judge.

23        As Mr. Huffman stated, he should have done a

24      notice of alibi.  There were multiple witnesses.

25      He did call one alibi witness at trial, Sarah
```

94

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  94 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    Caldera.  And there were multiple witnesses
2    ready, willing, and available to testify as to
3    the whereabouts of Tevin Williams at the time of
4    the shooting of John Lee.  And I believe there is
5    a reasonable probability that the outcome of the
6    trial would have been different if those
7    witnesses would have been called to testify.
8         I know that the State, in questioning Stuart
9    Huffman, made great hay over the fact that
10   Jessica Fitzpatrick was an ex-girlfriend and so
11   probably wouldn't have had any credibility.
12        But as can be seen from Movant's Exhibit 70
13   and what was entered at trial and the testimony
14   of Chelsea Brashears, the only other witness that
15   really could corroborate John Lee's story was an
16   ex-girlfriend of Desmond Williams.
17        And I would ask the Court to review the last
18   few minutes of her video because she does
19   indicate that she's afraid of Mr. Williams.  And
20   so -- and it would be Desmond Williams, not Tevin
21   Williams.  But Desmond and Tevin are related.
22   And she implicated Desmond Williams, as can be
23   seen in her impeachment testimony.  She was the
24   girlfriend of Desmond Williams and said that
25   Desmond Williams gave the gun to Tevin and then

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 95 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    recanted that testimony at trial. I believe that

2    alone would be sufficient to grant Mr. Williams a

3    new trial. As far as the specific points, I --

4    as to 9(a) regarding appellate counsel, I believe

5    that I am standing on the record. I am not

6    offering any independent evidence regarding that.

7            THE COURT: What does the record -- I

8    guess we are to the point now --

9            MS. FAUST: We're relying on the

10   appellate record --

11           THE COURT: Okay. Let --

12           MS. FAUST: -- and the trial

13   transcript.

14           THE COURT: -- me ask the question

15   before you try to answer it.

16           MS. FAUST: Sure.

17           THE COURT: I would like to know, do

18   you think you have submitted evidence in support

19   of the claim made at 9(a), and if so, what is it?

20           MS. FAUST: I do. It would be the

21   appellate brief. Also, the State has asked you

22   to take judicial notice of the entire appellate

23   file of -- and Southern District case -- or the

24   Western District case, and I believe that State's

25   Exhibit 70 also goes toward the argument in 9(a).

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 96 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    As I said, I do concede that -- I believe that

2    the State is correct that the case law cited in

3    the claim has been superseded as is indicated

4    oddly in the claim itself.  But, again, I

5    would -- I would rely on those three documents

6    specifically in support of that claim.

7              THE COURT:  Okay.  Let's look at 9(b).

8    Evidence has been presented to support the claim

9    of error made in 9(b).  Do you think that's

10   State's Exhibit 70?

11             MS. FAUST:  Yes, Your Honor.

12             THE COURT:  Okay.  9(c) is the failure

13   to issue subpoenas?

14             MS. FAUST:  I'm sorry, Judge, if I may

15   backup.  On State's Exhibit 70, I think

16   specifically the impeachment testimony regarding

17   her fear of Desmond Williams and specifically the

18   evidence that she said it was a black gun that

19   she saw, when the trial testimony, and testimony

20   today, was provided by Darnell Lee that it was a

21   chrome gun.

22             THE COURT:  9(c) is the failure to

23   issue subpoenas to three witnesses?

24             MS. FAUST:  Yes, Your Honor.  And I

25   believe Stuart Huffman's testimony supports this

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 97 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1     claim, and so does the -- do the exhibits that

2     were offered, the affidavits, and Alesha Davis

3     and Jessica Fitzpatrick's testimony.

4              MS. SHOOK:  I would suggest to the

5     Court that evidence was not submitted to the

6     Court with regard to Claim C as it relates to

7     Melvin Jackson.  The Court doesn't have what his

8     proposed -- or what his expected testimony would

9     have been had he testified or any evidence from

10    which the Court could find that he would have

11    been available and willing to testify if

12    subpoenaed at trial.

13             MS. FAUST:  And, Judge, I believe that

14    testimony was offered through Stuart Huffman,

15    that he had spoken to him; he did anticipate him

16    to testify and to provide the testimony as stated

17    in the claim.

18             MS. SHOOK:  I think the case law on

19    post-conviction relief matters is very clear that

20    in order to present adequate evidence of that for

21    the Court to consider and find in a Movant's

22    favor that they have to call the witness to

23    testify, put in what their testimony would be and

24    again testify that they would have been available

25    and willing to come testify if subpoenaed.

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  98 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1          THE COURT:  I don't recall Alesha Davis

2     being asked that either.  Was she asked that?

3          MS. FAUST:  Yes, she was asked if she

4     was available and where she lived, and she lived

5     in St. Louis -- or I'm sorry, Springfield, and

6     was available.

7          THE COURT:  You think you asked her

8     that when she was here?

9          MS. FAUST:  Yes.

10          THE COURT:  Okay.  I guess the record

11     will be what it is.  But nobody asked her why she

12     didn't show up.  In fact, she wasn't even

13     subpoenaed to be here today.

14          MS. FAUST:  She wasn't able to be

15     found.

16          THE COURT:  Pardon?

17          MS. FAUST:  I couldn't find her to

18     subpoena her.  That's why she isn't under

19     subpoena.  But I also note for the record that

20     her affidavit has been admitted into the record.

21          THE COURT:  Okay.  And D, that's the

22     issue with the photo lineup?

23          MS. FAUST:  Yes.  And, Judge, that

24     evidence, both exhibits -- well, it was State's

25     Exhibit 66 and 67, and Movant's corollary 7 and 8

99

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE  99 of 102

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    have previously been admitted at trial.  And if

2    the Court wishes to retain a copy of that for its

3    review, I believe the State said that the color

4    copy you could --

5              THE COURT:  We will look at that after

6    the close.  Let's close the record here as soon

7    as we can, after we've covered everything.

8         So there are four points of error that are

9    raised by the Movant; is that correct?  A, B --

10             MS. FAUST:  Yeah.

11             THE COURT:  -- C and D?  Okay.

12   Anything further from the Movant?

13             MS. FAUST:  No.

14             THE COURT:  Ms. Shook, anything further

15   from you?

16             MS. SHOOK:  I would just say that I

17   don't think that there is sufficient evidence for

18   the Court to even consider the Claim C as it

19   relates to Melvin Jackson.

20        I don't think that the evidence that the

21   Court has is sufficient to find in Movant's favor

22   with regard to Alesha Davis or Jessica

23   Fitzpatrick either.

24        But I do think the Court should at least

25   evaluate those two claims based on the evidence

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

1    that was presented here.

2         And with regard to D, which is the only one

3    I haven't already responded to, I do think that

4    the Court has evidence to consider; although, I

5    don't think that it supports a finding in

6    Movant's favor because the evidence wasn't

7    consistent with what was outlined in the claim as

8    far as what the evidence was expected to be.

9              THE COURT:  Okay.  Anything further

10   before we close the record, from the Movant?

11             MS. FAUST:  No.

12             THE COURT:  From the State?

13             MS. SHOOK:  No.

14             THE COURT:  Okay.  We will be off the

15   record and in recess.

16                  (Court stood in adjournment

17             at 3:36 P.M.)

18

19             *    *    *    *    *

20

21

22

23

24

25

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 101 of 102

# CERTIFICATE OF COURT REPORTER

I, Tina R. Miller, Certified Court Reporter, do hereby certify that I am the Official Court Reporter of Division I of the Greene County Circuit Court, State of Missouri; that on the 22nd day of May, 2018, I was present and reported all of the proceedings had and entered of record in the case of TEVIN L. WILLIAMS vs. STATE OF MISSOURI; Case No. 1631-CC00958 and Appeal No. SD35695.

I further certify that the foregoing pages contain a true and accurate reproduction of my Stenograph shorthand notes of said proceedings.

Costs for preparing this transcript are in compliance with Supreme Court Rule 84.18.

Transcript completed and electronically signed this 4th day of December, 2018.


*/s/ Tina R. Miller*
_____
Tina R. Miller, CCR
Official Court Reporter


\* \* \* \* \*

Electronically Filed - SOUTHERN DISTRICT CT OF APPEAL - December 11, 2018 - 02:55 PM

Respondent's Exhibit 9
Williams v. Buckner
6:21-CV-03138-RK
PAGE 102 of 102